IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| THE RESEARCH INSTITUTE AT NATIONWIDE CHILDREN'S HOSPITAL,<br><br>Plaintiff,<br><br>v.<br><br>ILLUMINA, INC.,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

C.A. No. <u>1:25-cv-00683-UNA</u>

**JURY TRIAL DEMANDED**

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff, the Research Institute at Nationwide Children's Hospital ("Nationwide Children's" or "Plaintiff"), by and through its undersigned counsel, for its Complaint against Defendant Illumina, Inc. ("Illumina" or "Defendant"), alleges as follows:

## NATURE OF THE ACTION

1.     This is a civil action for infringement of United States Patent No. 9,552,458 (the "'458 Patent") arising under the Patent Laws of the United States, 35 U.S.C. §§ 271 *et seq*.

## THE PARTIES

2.     Nationwide Children's is one of the largest pediatric research centers in the United States and is ranked in the top six for National Institutes of Health funding among free-standing children's hospitals. Nationwide Children's is dedicated to conducting cutting-edge research, identifying new approaches for the prevention, diagnosis, and treatment of childhood diseases, and to taking research discoveries from the lab to the patient's bedside.

3.     Illumina is a company organized and existing under the laws of the State of Delaware, with its principal place of business at 5200 Illumina Way, San Diego, California,

92122.[1] Illumina has appointed The Corporation Trust Company, Corporation Trust Center 1209 Orange Street, Wilmington, Delaware 19801 as its agent for service of process.

## JURISDICTION AND VENUE

4.      This is an action for patent infringement arising under the patent laws of the United States, including 35 U.S.C. §§ 271 *et seq*. This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338(a).

5.      Personal jurisdiction exists over Defendant because it is an entity organized under the laws of Delaware. This Court also has personal jurisdiction over Defendant because Defendant conducts business in Delaware and because infringement has occurred and continues to occur in Delaware.

6.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b), (c), and 1400(b) at least because Illumina is an entity organized under the laws of Delaware and therefore resides in Delaware for purposes of venue under 28 U.S.C. § 1400(b).

## THE PATENT-IN-SUIT

7.      The '458 Patent, entitled "Comprehensive Analysis Pipeline for Discovery of Human Genetic Variation," was duly and legally issued by the United States Patent and Trademark Office (USPTO) on January 24, 2017. The '458 Patent names Peter White, David Lawrence Newsom, and Yangqiu Hu as joint inventors. A true and correct copy of the '458 Patent is attached hereto as Exhibit 1.

---

[1] *See, e.g.,* https://www.illumina.com/company/contact-us/locations.html.

8.    The '458 Patent is assigned to Nationwide Children's. Nationwide Children's is the exclusive owner of all rights, title, and interest in and to the '458 Patent, and has the right to bring this suit to recover damages for any current or past infringement of the '458 Patent.[2]

9.    Claims of the '458 Patent concern, among other things, systems and methods for improving utilization of processing of a computing system analyzing genetic sequence data. For instance, claim 1 of the '458 Patent recites:

> 1. A method for improving the utilization of processing capability of a computing system analyzing genetic sequence data associated with a subject, the method comprising:
>
> receiving, by the computer system, the genetic sequence data associated with the subject, the genetic sequence data specifying a plurality of chromosomes and mitochondrial DNA;
>
> splitting the genetic sequence data into a plurality of subsets, each subset corresponding to either one chromosome of the plurality of chromosomes or the mitochondria DNA;
>
> defining an inter-subset of the genetic sequence data for read pairs with both mates mapped to different subsets of the plurality of subsets; and
>
> analyzing the obtained genetic sequence data by the computer system by dividing one or more processing steps in the analysis among a plurality of parallel processing paths, each parallel processing path corresponding to a subset of the plurality of subsets, each parallel processing path corresponding to either a chromosome of the plurality of chromosomes or the mitochondrial DNA.

10.    The '458 Patent claims priority to U.S. Provisional Application 61/611,960, which was filed on March 16, 2012. The '458 Patent issued from U.S. Appl. No. 13/838,677, which was

---

[2]*See*
https://assignment.uspto.gov/patent/index.html#/patent/search/resultAbstract?id=9552458&type=patNum

filed on March 15, 2013 and published by the USPTO as U.S. Appl. Publ. No. 2013/0311106 (the "'106 Publication") on November 21, 2013. A true and correct copy of the '106 Publication is attached hereto as Exhibit 2.

11.    The '458 Patent is valid and enforceable and enjoys a statutory presumption of validity pursuant to 35 U.S.C. § 282.

12.    Illumina has never, either expressly or impliedly, been licensed under the '458 Patent.

## BACKGROUND OF THE INVENTION

13.    Next-generation sequencing (NGS) is a revolutionary technology for determining and analyzing a patient's genetic sequence. It has the potential to foster significant breakthroughs in understanding complex genetic patterns, diagnosing disease, developing therapeutic interventions, and ushering in the age of precision medicine.

14.    The goal of the NGS process is to generate high-resolution, large-scale DNA or RNA sequence data to explore genomic variation, understand biological function, and inform research or clinical decision-making—ranging from disease diagnosis and risk assessment to therapeutic targeting and population-scale studies.

15.    The NGS process starts with extracting and purifying genomic DNA obtained from a subject, followed by fragmentation and sequencing library preparations. These libraries undergo billions of parallel sequencing reactions, each decoding a short DNA fragment and determining the order of nucleotides—adenine (A), cytosine (C), guanine (G), and thymine (T). The resulting data undergoes a multi-stage analysis pipeline often described in three phases: "primary," "secondary," and "tertiary" analyses.

16.     "Primary" analysis involves processing raw signals generated by the sequencing instrument into base calls and assigning quality control metrics (*e.g.*, base quality scores), resulting in millions of short DNA sequences known as "reads" (*i.e.*, sequences of several dozen base pairs). These reads are typically represented in FASTQ format and serve as the foundation for the downstream computational analysis phases. In many sequencing protocols, both ends of each DNA fragment are sequenced, producing paired-end reads (also known as mate-pair reads or "mates"), which improve alignment accuracy and helps resolve structural variation, repetitive regions, and insertions or deletions.

17.     "Secondary" analysis involves aligning the sequence reads to a reference genome (e.g., the reference human genome) and identifying differences between the sample and the reference. This step typically includes read mapping, duplicate marking, base quality recalibration, and variant calling to detect genomic alterations such as single-nucleotide variants (SNVs), insertions, deletions (indels), and structural variants.

18.     Finally, "tertiary" analysis focuses on the annotation, prioritization, and interpretation of these variants to assess their potential biological relevance or clinical significance. This may involve integrating information from population databases, functional annotations, and clinical literature to assess whether variants are likely pathogenic, benign, or of uncertain significance.

19.     NGS has enabled transformative advances in medicine, including comprehensive newborn screening, cancer genomics, rare disease diagnosis, pharmacogenomics, infectious disease surveillance, and many other personalized or precision medicine approaches.

20.     Realizing the full promise of NGS in medicine requires efficient and accurate data analysis. Achieving that goal is difficult because NGS generates vast volumes of data. For context,

sequencing a single human genome involves decoding approximately 3.2 billion base pairs, typically by generating hundreds of millions of short DNA fragments. In the paired-end sequencing approaches that are typical today, each fragment is sequenced from both ends, producing two reads of around 150 base pairs each, yielding roughly 300 bases per fragment. Managing, processing, and interpreting this scale of data demands substantial computational resources and sophisticated bioinformatics pipelines.

21.     But while fast and accurate sequencing paved the way for transformative advances in medicine, realizing that potential was initially constrained by limitations in secondary analysis. At the time of invention, the volume of raw data emerging from primary analysis was growing faster than existing computational tools used for secondary analysis could manage. Secondary analysis pipelines lacked both the necessary speed and the required accuracy, and were often non-deterministic in their outputs. Moreover, because the secondary analysis tools were largely developed independently, they lacked integration, and it was therefore difficult even for an experienced bioinformatician to connect them appropriately.

22.     Consequently, as NGS technology evolved, the exponential growth in data generation outstripped the ability to process that data and created a computational bottleneck. This disconnect between data production and interpretation created a major bottleneck in the clinical and research utility of NGS.

23.     At the time of filing, the inventors of the '458 Patent—Peter White, David Lawrence Newsom, and Yangqiu Hu—were all scientists with the Research Institute at Nationwide Children's Hospital.

24.     Dr. Peter White is the inaugural Chief Data Sciences Officer of the Research Institute at Nationwide Children's and a tenured professor of pediatrics at The Ohio State

University College of Medicine. He is a renowned research scientist and innovator with expertise in genetics and genomics, biomedical data sciences, precision medicine, big data, and cloud computing, and also holds the prestigious Battelle Endowed Chair in Quantitative and Computational Biology at Nationwide Children's.[3] David Newsom (deceased) was a founder and technical director of the Biomedical Genomics Core at Nationwide Children's – a shared resource facility providing genomic services to investigators within Nationwide Children's, at Ohio State University, and multiple organizations nationally.[4] He was nationally recognized for his work in genetic sequencing. Yangqiu Hu holds a PhD from the University of Washington and currently serves as the Vice President of Data Sciences at Fidelity.

25.     The inventors recognized that advancing the state of NGS and bioinformatics required optimizing the entire NGS secondary data analysis workflow by bridging the widening gap between sequencing instrument output and the downstream analysis and interpretation of genomic data.

26.     To achieve the necessary optimization in speed, accuracy and determination, the inventors described and claimed a secondary-analysis workflow based on a new parallelization strategy that improved upon those of other systems in the field. At a high level, the claimed secondary workflow parallelization strategy involved splitting the genetic sequence data into subsets of substantially equal size and an "inter-subset" of reads (where the two mates were mapped to different ones of those subsets), and then analyzing the genetic sequence data along multiple parallel processing paths, each corresponding to one or more of the subsets.

---

[3] https://www.nationwidechildrens.org/newsroom/news-releases/2023/04/peter-white-cdso-announcement; https://www.nationwidechildrens.org/find-a-doctor/profiles/peter-white.
[4] https://pmc.ncbi.nlm.nih.gov/articles/PMC2918025/.

27.     This claimed solution enabled scalable parallel processing of the workflow without loss of accuracy. By splitting the genetic sequence into subsets of substantially equal sizes, the claimed invention could more evenly distribute work across any number of computing resources (*e.g.*, based upon input file size, memory or type or number of processors) and could thus scale to utilize the full resources of arbitrarily large parallel computing platforms, such as high-performance computing (HPC) clusters, Hadoop clusters with MapReduce, field-programmable gate arrays (FPGAs), graphics processing units (GPUs), or central processing units (CPUs) in a shared memory server with task creation.

28.     But splitting the workload into many small subsets created an accuracy problem: as the number of subsets grew, so did the number of reads that would span multiple subsets. At the time, there were no methods for tracking and decoding such reads in a parallel manner. *See, e.g.,* Exhibit 1, '458 Patent at 17:37-18:6 (other researchers representing that "parallelization of interchromosomal read detection process was not possible"). While other parallelization techniques discarded those reads, doing so created accuracy issues for certain phases of the secondary analysis workflow, and those accuracy issues made it untenable for a highly parallelized workflow, like the one the inventors envisioned, to adopt the same approach.

29.     To mitigate the accuracy issues, contemporaneous research on parallelizing the secondary analysis workflow simply settled for limited parallelization. For example, the '458 Patent discloses that in 2012, researchers working on a system called HugeSeq had proposed splitting and processing the genetic sequence data on a strictly per-chromosome basis and simply discarding inter-chromosomal reads. But that approach had shortcomings: it limited the degree of parallelization to 23 threads of execution (the number of chromosomes); it created uneven workloads across the threads because different chromosomes are differently sized; it reduced data

quality impacting accuracy of detection of indels and structural variants, and it introduced error (particularly in the deduplication stage) because it lacked a strategy for dealing with inter-chromosomal reads.

30.     The inventors of the '458 Patent overcame these deficiencies through a novel approach—splitting the genetic sequence data into substantially equal-sized subsets (which could be distributed evenly across any number of parallel processes), and defining an inter-subset for reads that spanned two subsets—either on the same chromosome or different chromosomes. The inventors thus enabled inter-subset reads to be tracked and processed in parallel with the other reads generated by the primary analysis step. This solution enabled markedly faster run-times, eliminated non-deterministic variability, and preserved data integrity—advantages that were unattainable with prior ad-hoc pipelines.

31.     The inventors implemented their ideas in a system named "Churchill." When it was deployed, Churchill demonstrated that the invention was able to perform a secondary analysis substantially more quickly, accurately, and repeatably ("deterministically") across all levels of parallelization than had competing approaches.

32.     In a comparative study using a set number of computing cores, Churchill completed the genetic analysis of a DNA sample in under 10 hours—twice as fast as HugeSeq (20 hours) and more than three times as fast as another parallel processing approach called GATK-Queue (took 35 hours). *See, e.g.,* Exhibit 1, '458 Patent at 19:37-40, Fig. 9. Figure 9 of the '458 Patent compares Churchill's performance at various processor core counts against the prior art serial operation and the competing parallelization strategies of the time.



FIG. 9

Exhibit 1, '458 Patent at FIG. 9

33.    Churchill was also more scalable than the competing approaches—meaning, it could use additional cores more efficiently than had previous approaches. *See, e.g.,* Exhibit 1, '458 Patent at 19:37-62, Fig. 10. Figure 10 of the '458 Patent shows Churchill maintaining near linear speedup as the number of processor cores grows, while competing approaches fail to scale and thus demonstrate an asymptotic behavior.



FIG. 10

Exhibit 1, '458 Patent at FIG. 10

34.     Churchill also maintained far higher processor utilization rates than competing approaches. *See, e.g.,* Exhibit 1, '458 Patent at 19:23-36, Fig. 8. As shown in Figure 8 of the '458 Patent, Churchill could use 48 processing cores at an average of 85% utilization—much higher than the 46% utilization maintained by HugeSeq's parallelization strategy and 30% for GATK-Queue's.



FIG. 8

Exhibit 1, '458 Patent at FIG. 8

35.    The inventors' approach not only increased speed and accuracy, but also permitted the parallelized calculations to be "deterministic," meaning that the genomic data analysis was reproducible across all levels of parallelization. *See, e.g.,* Exhibit 1, '458 Patent at 20:16-21; 18:40-43. Other sequence analysis methods were not deterministic, such that the mutation profile of a given subject would be different after repeated analysis of the same genetic data. The lack of reproducibility in those methods was a serious drawback that created uncertainty in the diagnosis of patients suffering from unidentified genetic diseases.

36.    Due to its scalability and efficiency, the invention of the '458 Patent made the computationally efficient analysis of a high-depth whole genome sample possible in *less than two hours* using the computing resources of the time. *See, e.g.,* Exhibit 1, '458 Patent at 19:41-49. By making personalized genetic screening and variant detection possible in near-real time, the invention opened the door to a host of clinical applications in the field of personalized medicine.

37.     During prosecution, the USPTO explicitly recognized that the invention described and claimed in the '458 Patent is directed to an improvement to bioinformatics technology and is significantly more than an abstract idea. Exhibit 10, '458 Patent PH Statement of Reasons for Allowance dated 9/23/2016 at pp. 2-3.

38.     Specifically, the USPTO stated that the '458 Patent "invention is significantly more than the judicial exception of an abstract idea of mathematical relationships because of an improvement to bioinformatics technology as evidenced by the data in the figures and arguments provided on June 13, 2016." *Id.*

39.     The data in the figures and arguments provided by applicant on June 13, 2016 and credited by the USPTO include many of the references to the Patent figures and specification set forth above, including references to and discussion of Figures 8-12. Exhibit 11, '458 PH Response to Non-Final Office Action dated 6/13/2016 at 13-17.

## ILLUMINA'S INFRINGING ACTIVITIES

40.     Plaintiff incorporates and realleges all of the above paragraphs as though fully set forth herein.

41.     DRAGEN™ Bio-IT software (hereinafter "DRAGEN") was originally developed by Edico Genome, Inc. ("Edico"). In 2018, Edico was purchased by Illumina, and thus Illumina has been manufacturing, selling, and offering for sale DRAGEN in the United States since 2018.[5] DRAGEN is a software suite for the analysis of sequencing data. On information and belief, DRAGEN may be integrated into on-instrument, on-premises and cloud-based computing infrastructures.

---

[5] *See* https://www.illumina.com/company/news-center/press-releases/2018/2349147.html.

42.     Illumina's manufacture, sale, and offer for sale of DRAGEN infringes the '458 Patent including at least claims 1-4 and 6.

43.     DRAGEN implements a method for improving the utilization of the processing capability of a computing system analyzing genetic sequence data associated with a subject. For example, the DRAGEN software has been used to perform secondary data analysis in the context of urgent clinical care, enabling rapid identification of genetic variants for the emergency management of genetic diseases. *See* Exhibit 3, Miller *et al*., "A 26-hour system of highly sensitive whole genome sequencing for emergency management of genetic diseases," Genome Medicine (2015) 7:100.

44.     DRAGEN obtains genetic sequence data associated with a subject (e.g., a patient). For example, DRAGEN uses FASTQ and BAM/CRAM files as inputs, both of which contain genomic data. *See*, *e.g.*, Exhibit 4.

45.     On information and belief, DRAGEN receives and splits a patient's genetic information (including chromosomal and mitochondrial DNA) into subsets and uses parallel processing to rapidly compare subsets of a patient's genetic information to that of a reference genome. For instance, on information and belief, DRAGEN incorporates and/or implements many of the methods described in Edico's U.S. Patent 10,049,179, which postdates the priority date of the '458 patent, and is attached hereto as Exhibit 5.

46.     Figures 4, 40C, and 40D of U.S. Patent 10,049,179 show that DRAGEN uses a plurality of parallel processing paths which correspond to the number of processor cores of the computer system on which the DRAGEN software is running to analyze chromosomal and mitochondrial DNA. *See* Exhibit 5; *see also* Exhibit 4, DRAGEN Bio-IT Platform 3.7 User's Guide, at 18-19. On information and belief, this architecture allows DRAGEN to analyze aligned

sequence data in parallel using an arbitrary number of processing resources, thereby reducing the analysis time.

47.     Illumina engages third parties to sell, offer to sell, and otherwise commercialize the infringing DRAGEN software. For example, a senior data analyst at Eurofins Viracor, a clinical diagnostics and drug development company, noted that Eurofin Viracor uses DRAGEN to process terabytes of data. *See* Exhibit 6, "To process and analyze that data in house would require us to build out a lot of infrastructure and have more people manage it. So that was one of the key reasons we moved to the cloud—those FPGA-enabled servers that run the DRAGEN analyses are available through Connected Analytics, and the analysis packages are ready to go."

48.     As another example, PerkinElmer Genomics offers whole genome sequencing and deletion/duplication trio analysis. Exhibit 7. As noted on the patient form, this sequencing and analysis is performed using DRAGEN. *Id*. at 3, Section entitled "Methods and Limitations": "Primary data analysis is performed using Illumina DRAGEN Bio-IT Platform v.2.03. Secondary and tertiary data analysis is performed using PerkinElmer's internal ODIN v.1.01 software for SNVs and Biodiscovery's NxClinical v.4.3 or Illumina DRAGEN Bio-IT Platform v.2.03 for CNV and absence of heterozygosity (AOH)."

## COUNT I

### Infringement of U.S. Patent No. 9,552,458

49.     Plaintiff incorporates and realleges all of the above paragraphs as though fully set forth herein.

50.     Illumina has infringed, and continues to infringe, at least claims 1-4, and 6 of the '458 Patent under 35 U.S.C. § 271(a), either literally and/or under the doctrine of equivalents, by making, using, offering for sale, and/or selling DRAGEN, which performs the claimed invention,

in the United States or by directing and/or controlling the performance of the claimed steps by users of DRAGEN in the United States.

51.     Attached as Exhibit 8 is a preliminary and exemplary claim chart showing specifically, element-by-element, how Illumina's DRAGEN infringes at least claims 1-4, and 6 of the '458 Patent. This claim chart is illustrative only and not intended to limit Plaintiffs' right to modify this chart or provide any other claim charts, including to assert infringement of other claims of the '458 Patent, or to allege that other Illumina products infringe the '458 Patent.

52.     Illumina's infringement of the '458 Patent is damaging and will continue to damage Plaintiff.

53.     In addition, or in the alternative, Illumina has also induced infringement, and continues to induce infringement, of at least claims 1-4, and 6 of the '458 Patent under 35 U.S.C. § 271(b). Illumina actively, knowingly, and intentionally induces infringement of the '458 Patent by selling or otherwise supplying DRAGEN with the knowledge and intent that users of DRAGEN will infringe the '458 Patent.

54.     Illumina acts with the knowledge and intent to encourage and facilitate third-party infringement through the dissemination of DRAGEN and/or the creation and dissemination of supporting materials, instructions, product manuals, and/or technical information. In addition, Illumina engages third parties, such as EuroFins (Exhibit 6), and PerkinElmer (Exhibit 7), to sell, offer to sell, and otherwise commercialize the infringing DRAGEN software.

55.     Illumina is and has been aware of the '458 Patent and that DRAGEN infringes since at least November 13, 2018, when GenomeNext LLC, a prior exclusive licensee of the '458 Patent,

gave a presentation to Illumina emphasizing the importance of the '458 Patent to scalable genomic analysis.

56.     Additionally, on or around September 10, 2019, Nationwide Children's gave a presentation to Illumina that specifically identified the '458 Patent, including the language of claim 1, and its coverage. After a review of the '458 Patent and its relevance to DRAGEN, Illumina declined to license the '458 Patent on October 24, 2019.

57.     Illumina has also known of the '458 Patent and that DRAGEN infringes since Nationwide Children's November 8, 2023 notice letter to Illumina and the parties' communications regarding the '458 Patent thereafter.

58.     For example, on November 14, 2023, Illumina acknowledged receipt of the notice letter and confirmed its intent to review the '458 Patent.



59.     On February 23, 2024, Illumina responded that it did not believe it needed a license, but it provided no support for that position. Instead, the letter merely stated Illumina's bare conclusions that the claims of the '458 Patent are invalid—due to unspecified subject matter eligibility concerns and unspecified prior art—and stated without any support that Illumina does not infringe. Illumina provided no further explanation. The letter cited no prior art suggesting that the claims lacked novelty or recited only obvious matter. Nor did the letter cite any case law or analysis suggesting that the claimed useful improvements to secondary workflow analysis constitute patent ineligible subject matter—even though the USPTO had specifically considered and rejected that proposition before allowing the claims. The letter also provided no explanation of why Illumina's DRAGEN system does not infringe.

60.     Prior to any communication between the parties, Illumina also had knowledge of the '458 Patent through prosecution of its own patent applications, including prosecution of Edico's patent applications, because Illumina acquired Edico in 2018. For example, on December 2, 2014, Edico cited the '106 Publication during prosecution of U.S. Patent Appl. No. 14/158,758, which later issued as U.S. Patent No. 9,483,610. A copy of Edico's December 2, 2014 Information Disclosure Statement, which is publicly available on the USPTO's website, is attached hereto as Exhibit 9.

| | | | | | |
|---|---|---|---|---|---|
| Substitute for form 1449/PTO | | | | Complete if Known | |
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** *(Use as many sheets as necessary)* | | | Application Number | 14/158,758 | |
| | | | Filing Date | January 17, 2014 | |
| | | | First Named Inventor | Robert McMillen | |
| | | | Art Unit | 1631 | |
| | | | Examiner Name | J. Lin | |
| Sheet | 1 | of | 1 | Attorney Docket Number | 46866-501001US |

| | | U.S. PATENT DOCUMENTS | | | |
|---|---|---|---|---|---|
| Examiner Initials* | Cite No.¹ | Document Number Number-Kind Code² (if known) | Publication Date MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
| | A* | US-8,209,130 | 06-26-2012 | Kennedy et al. | |
| | B* | US-8,594,951 | 11-26-2013 | Homer | |
| | C* | US-20050131649-A1 | 06-16-2005 | Larsen et al. | |
| | D* | US-20080086274-A1 | 04-10-2008 | Chamberlain et al. | |
| | E* | US-20120001615-A1 | 01-05-2012 | LEVINE | |
| | F* | US-20130091121-A1 | 04-11-2013 | GALINSKY | |
| | G* | US-20130204851-A1 | 08-08-2013 | BHOLA et al. | |
| | H* | US-20130245958-A1 | 09-19-2013 | FORSTER et al. | |
| | I* | US-20130311106-A1 | 11-21-2013 | White et al. | |
| | J* | US-20130316331-A1 | 11-28-2013 | Isakov et al. | |
| | K* | US-20130324417-A1 | 12-05-2013 | Kennedy et al. | |
| | L* | US-20130332081-A1 | 12-12-2013 | Reese et al. | |
| | M* | US-20130338934-A1 | 12-19-2013 | Asadi et al. | |
| | N* | US-20140114582-A1 | 04-24-2014 | Mittelman et al. | |
| | O* | US-20140121116-A1 | 05-01-2014 | Richards et al. | |
| | P* | US-20140200166-A1 | 07-17-2014 | McMillen et al. | |
| | Q* | US-20140236490-A1 | 08-21-2014 | McMillen et al. | |

61.    Other Illumina/Edico U.S. patents that cite the '106 Publication include US9618474, US9679104, US9697327, US9792405, US10068054, US10068183, US10691775, and US10847251. The '106 Publication was also cited during prosecution of two abandoned Edico patent applications, which published as US20170270245 and EP3329491A2. Thus, on information and belief, after publication of the application for the '458 Patent (i.e., the '106 Publication), and with knowledge of that publication, Illumina made and used the claimed invention in the United States.

62.    Illumina's continuing infringement of the '458 Patent will irreparably harm Plaintiff, and Illumina's infringement will continue unless enjoined by this Court pursuant to 35 U.S.C. § 283.

63.    On information and belief, Illumina's infringement of the '458 Patent is willful, justifying an award of increased damages and making this an exceptional case entitling Plaintiff to enhanced damages, and reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Illumina, granting Plaintiff the following relief:

A.    A judgment holding Illumina liable for direct and indirect infringement of the '458 Patent;

B.    Damages resulting from Illumina's infringement of the '458 Patent in an amount to be proven at trial, but no less than a reasonable royalty, such damages to be increased up to three times due to Illumina's willful infringement, with pre-judgment and post-judgment interest;

C.    An injunction permanently enjoining Illumina under 35 U.S.C. § 283 from infringing the '458 Patent, including by specifically prohibiting Illumina from making, using, offering for sale, selling, and/or importing into the United States any product which falls within the scope of the '458 Patent;

D    A judgment holding this to be an exceptional case, and an award to Plaintiff of its attorneys' fees and costs pursuant to 35 U.S.C. § 285; and

E.    Such other and further relief as the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b) and D. Del. LR 38.1, Plaintiff hereby demands a trial by jury on all issues so triable.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

OF COUNSEL:

*/s/ Karen Jacobs*

Stephen E. Baskin
Jonathan Weinberg
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Suite 900
Washington, DC 20006
(202) 737-0500

_____

Karen Jacobs (#2881)
Megan E. Dellinger (#5739)
Derek J. Fahnestock (#4705)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
kjacobs@morrisnichols.com
mdellinger@morrisnichols.com
dfahnestock@morrisnichols.com

Jeffrey D. Mills
KING & SPALDING LLP
500 West 2nd Street Suite 1800
Austin, TX 78701
(512) 457-2000

*Attorneys for Plaintiff*

Joseph D. Eng Jr.
KING & SPALDING LLP
1185 Avenue of the Americas, 34th Fl.
New York, NY  10036
(212) 556-2100

June 3, 2025